## SELDEN v. STATE.

Decided January 30, 1892.

*Instructions—Should be harmonious.*
> The giving of a correct instruction upon a point in a case will not cure an error in another instruction entirely variant, where there is nothing to show the jury which instruction to adopt. Thus, where in a murder case the jury are instructed that if deceased was in the act of striking defendant in self-defense when the fatal blow was given, the jury should convict of murder either in the first or second degree, the error in excluding from the jury the right to decide whether defendant acted under an irresistible passion, which would reduce the crime to manslaughter, is not cured by a distinct instruction upon that point properly stating the law.

APPEAL from *Miller* Circuit Court.

RUFUS D. HEARN, Judge.

No counsel for appellant.

*W. E. Atkinson,* Attorney General, and *Chas. T. Coleman* for appellee.

HUGHES, J. The appellant was convicted of murder in the second degree and sentenced to the penitentiary for twenty-one years. He appealed to this court.

The facts are substantially as follows: Appellant and his wife Ann had been separated and were living apart. The deceased Tama was the daughter of Ann and stepdaughter of the appellant. On the day of the killing the appellant went to the house of Gilbert Boykin, riding and carrying his gun. When he reached Boykin's house, he found Tama and her mother, the appellant's wife, there. He endeavored to persuade his wife to return and live with him, but she refused to do so. Tama about this time made some remark, whereupon appellant went to her and said: "I understand you said you wanted to kill me." He had his gun in his right hand, and she said to him, "Shoot." A bystander interfered and stopped the difficulty. While this was transpiring, Gilbert Boykin, who was a justice of the peace, was writing. The appellant inquired what he was doing, when

Boykin informed him that his wife wanted to put him under
bond to keep the peace. Appellant said he was not doing
anything, that he only wanted his wife ; and went to where
she was and began talking to her, trying to get her to go
home with him. Tama again spoke to appellant and dared
him to come out into the yard. She asked her mother
twice to come with her, when the appellant told her to let
his wife alone. Appellant and Tama went out into the
yard, and she cursed him. Appellant still had his gun. A
witness caught Tama; the appellant went into the house
where his wife was, and Tama followed him. His wife
started to go, when appellant said she should not go. Tama
said " Come on," and started with her little brother. Ann,
the appellant's wife, told Tama and her brother to go on;
she would stay there that night and come tomorrow. The
boy came back towards his mother, when the appellant
commanded him to go on, and asked him who he was going
to mind, his mother or Tama, and pushed and kicked him.
Tama then rushed upon the appellant and cut at him four or
five times with a knife, cursing all the while. She cut him
on the shoulder and head. While she was cutting at him,
Ann ran up and caught the appellant around the body with
her arms from behind, and thus held his arms. They were
separated, and Tama went to the rear of the house. Appel-
lant went into the house to get his gun, but Gilbert Boykin
secured it and hid it. Appellant then got some sticks, which
were taken from him. He went into the house with his
knife in his hand; a person tried to stop him, whom he
threatened to cut if he did not get out of his way ; he
jumped out at the window, rushed up to Tama, who was in
the back yard in the act of picking up a hoe. He stabbed
her once with the knife he had, ran and attempted to jump
the fence, but was caught on the palings.

In obedience to the command of the constable he went
toward him at the front gate, whither Tama also went. As
appellant went to the gate, he picked up a piece of plank
with which to strike Tama, but was prevented from doing so

by the constable.  Tama reached the front gate, fell and
expired in a short time.  It was but a few minutes, says one
of the witnesses, and another stated that it was twenty min-
utes, from the time the appellant and Tama were separated,
when she was cutting him with a knife, till she was stabbed
by the appellant.  As the appellant went into the house
when he jumped out at the window, he exclaimed "There's·
my life's blood," alluding to the blood flowing from the
wounds inflicted by Tama.  Tama was a very tall and stout
young woman.  The appellant was an old man.

The court gave for the State, amongst others, the follow-
ing instruction, which was excepted to by the appellant;.
and the giving of same was made a ground in his motion
for a new trial :

"8.  You are told that when a person voluntarily and
unlawfully enters into a difficulty, or unlawfully assaults·
another, that then they are denied the privilege of taking
advantage of the law of self-defense.  So, in this case, if
you find from the evidence beyond a reasonable doubt that
the defendant and deceased, Tama Thurman, engaged in a.
difficulty, and were separated or separated themselves, and
that the deceased had in good faith abandoned the contest,
and defendant unlawfully renewed the contest and difficulty,.
that he cannot avail himself of the law of self-defense ; and.
should you believe that, at the time or just previous to strik-
ing the fatal blow, the deceased was in the act of striking
or attempting to strike the defendant with a hoe or other
instrument, to defend herself, you should convict him of
either  murder in the first or second degree, as the proof
warrants or the proof will justify."

And for the defendant the court, with others, gave the-
following instruction :

"7.  If you find from the evidence that defendant stabbed
the deceased while laboring under passion excited by provo-
cation sufficient apparently to render the passion irresisti-
ble, or if you have a reasonable doubt thereof, you cannot

convict the defendant of murder either in the first or second degree."

The court of its own motion instructed the jury as follows:

"Manslaughter is the unlawful killing of a human being without malice, express or implied, and without delibera-tion. Manslaughter must be voluntary, upon a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible."

This eighth instruction given for the State tells the jury in the last clause: "And should you believe that, at the time or just previous to striking the fatal blow, the deceased was in the act of striking or attempting to strike the defendant, with a hoe or other instrument, to defend herself, you should convict him of either murder in the first or second degree, as the proof warrants or the proof will justify."

The first part of this instruction is so framed as to indi-cate that the court in giving it did so to impress upon the jury that if, after the first encounter between the defendant and Tama had ceased, he unlawfully renewed the difficulty, he could not invoke the law of self-defense, though he might have killed Tama when she was in the act of striking him with a hoe. This was correct. But the instruction ex-cluded from the jury the right and duty to consider whether at the time the fatal stab was given, the defendant was act-ing under and impelled by "a sudden heat of passion, caused by a provocation apparently sufficient to make the passion irresistible."

It is true that, in the seventh instruction given for the de-fendant, the court told the jury that if they found from the evidence that defendant stabbed the deceased, while labor-ing under passion excited by provocation sufficient appa-rently to render the passion irresistible, or that if they had a reasonable doubt whether this was the case, they could not convict the defendant of murder either in the first or second degree. This was correct; but it does not explain but contradicts the eighth instruction given for the State, which undertook to apply the law to the facts in the case.

By which of these instructions were the jury governed ?
It is impossible to tell. The probabilities are that they took
the seventh as stating the law in the abstract, and the eighth
as stating the law as applied to the hypothetical statement
of facts embodied in it. They might have so understood
them. The eighth instruction was so framed that it might
have misled the jury to the prejudice of the appellant, inas-
much as it might have been and probably was understood
to exclude from their consideration whether passion ex-
cited by provocation apparently sufficient to make the pas-
sion irresistible impelled the appellant to strike the fatal
blow, in case they should find from the evidence the hypo-
thetical state of facts stated in the instruction to really ex-
ist. The seventh given for the defense was not an explana-
tion, but a contradiction of this. "One correct instruction
will not always cure an erroneous one. The court should
harmonize the instructions, else they are calculated to con-
fuse and mislead the jury." Sackett's Instructions to Juries,
sec. 28, p. 25; *Quinn* v. *Donovan,* 85 Ill., 194. "The giv-
ing of a correct instruction upon a point in the case will not
obviate an error in an instruction on the other side, when
they are entirely variant, and there is nothing to show the
jury which to adopt." Sackett's Instructions to Juries, *su-
pra*; *Ill. Linen Co.* v. *Hough,* 91 Ill., 63; *Vanslyck* v. *Mills,*
34 Ia., 375.

We have discovered no other substantial error. For the
error indicated in the eighth instruction given for the State,
the judgment is reversed, and the cause is remanded for a
new trial.